Dotterer, trustee, *et al. v.* Freeman.

88 479
101 369
88 479
120 1027

1. When one borrows money from a bank to pay for land, gives his negotiable promissory note to the bank for the money and causes a conveyance of the land to be made to the president of the bank, such conveyance being absolute but intended only as security for the payment of the loan, it is no cause for setting the deed aside that the borrower intended that it should be made to the bank and not to its president, and that to this extent the transaction

was on his part a mistake, more especially if the note was re-newed several times and each renewal note, as well as the original, described the deed as it was in fact made.

2. Such deed would not be rendered void by usury in the last renewal note, there being no usury in the loan nor in the contract between the parties to the deed itself.

3. Such renewal note being negotiable and having been transferred after due, and an absolute deed to the premises held as security having been made by the president of the bank to the transferee of the note, the actual amount due on such note should be ten-dered to the transferee in order to entitle the debtor to maintain a bill against such transferee to vacate his title to the land. Even if such tender could be made after filing the bill, this was not done in the present case.

4. A motion for a new trial made at the same term at which a bill is taken *pro confesso* and final decree thereon rendered, should be granted if the verdict and decree be founded alone on the order taking the bill *pro confesso* and on complainant's affidavit as pre-scribed in section 4208 of the code, required to render the same effective, unless the bill shows on its face all the facts requisite to a recovery. Certainly this rule ought to be applied where facts vouched by matters of record in the same court, strongly tending to show that injustice has been done, are brought to the attention of the presiding judge at the hearing of the motion for a new trial.

December 7, 1891.

Equity. Mistake. Usury. Deed. Promissory note. Tender. New trial. Before Judge RONEY. Richmond superior court. April adjourned term, 1891.

On March 20, 1884, Freeman filed his bill against Roberts, the Bank of Augusta and Mary A. Newby, of Richmond county, and her trustee, Dotterer, of South Carolina, alleging, in brief : In April, 1879, he bought at the city of Augusta sheriff's sales for taxes certain described land with the improvements thereon, for $300, and agreed with the Bank of Augusta to borrow that sum from it and to secure it by a conveyance of the land. Having obtained the money he went to the sheriff to receive the deed, which was prepared and ready for sig-nature. To save the expense of two deeds he requested the sheriff to make the deed directly to the bank, which

was agreed to be done, though by some mistake the name of Roberts, its president, was inserted as grantee instead of the bank. The bank recognized complainant as the owner, subject only to its right to hold the property. as security, and took from him a note for the sum mentioned, reciting therein that the deed was held by it as collateral security for the debt. This note was taken up by his giving a new note with the same conditions and recitals, and finally, after successive notes had been thus given, he gave a note dated March 10, 1880, which he was unable to pay at its maturity, but retained possession of the premises until some time in April, 1882. He has never been sued on this note and recognizes that he is still liable thereon. On information and belief he charges that after he failed to meet this last note, the bank, by some pretended conveyance from Roberts and not from the bank, sold the note· to J. M. Newby as agent of Dotterer, trustee of Mary Newby, who now holds it together with a pretended deed to the land, dated March 8, 1881, signed by Roberts individually. The note in question was usurious on its face, and Roberts, the bank, Newby and Dotterer, at the time of the pretended conveyance had notice that the note was infected with usury, and that neither the bank nor Roberts got any title nor could convey a good title. The conveyance was made without complainant's knowledge or consent, without taking the course provided by law in such cases, and without even a compliance with the terms of the note, if it should be held that, infected with usury as it was, anything therein could authorize a sale of the land. Therefore the conveyance is void and Dotterer has no title ; but owing to the failure to have a title made to petitioner by the sheriff, he is unable to recover by law. Newby, Dotterer, the bank and Roberts had knowledge of all the facts above set forth. In February, 1881, recognizing that he was justly indebted to

the bank $300 and lawful interest, he made a tender thereof to it in lawful money and legal tender, demanding a surrender of the note and a deed from the bank to the property, which was refused. Offering to do equity, he prays to be directed how much is due, and whether it should be paid the bank or Dotterer, offering to pay it to the one to whom it is due; for a decree against the defendants, requiring them, upon payment of the sum due, to reconvey the land to him; for a decree cancelling the deed from Roberts to Dotterer, trustee, as a cloud upon his title, upon the payment of any sum due by him; and for general relief.——Attached as exhibits are the deed from Roberts to Dotterer, trustee, for a consideration of $378.69, made March 14, 1881, and recorded April 5, 1882; and the two notes of Freeman, dated respectively May 1, 1879, and March 10, 1880, each for $300; payable to the Bank of Augusta or the order of its cashier. They recite that the maker has deposited with the bank, as collateral security for their payment, the deed to Roberts to the property in question, which, or any part thereof, the maker authorizes the the bank or its president or cashier to sell without notice, at public or private sale, at the option of the bank or its president or cashier, in case of the non-payment of the note, applying the net proceeds to its payment, including interest at the rate of twelve per cent., and all counsel fees and expenses incurred, and accounting to him for the surplus, if any, and in case of deficiency he promises to pay the bank the amount thereof forthwith after such sale, with legal interest; and that, to secure their payment with any other indebtedness due or to become due, the bank is authorized to retain and sell said collateral; and any deposit made with it, whenever deemed advisable, and apply the same to the payment thereof.

The subpœna to this bill named as the parties defend-

ant, "The Bank of Augusta and William S. Roberts *et al.*"
The bill was personally served upon Roberts, the Bank
of Augusta and Mrs. Newby on March 25, 1884. On
June 9, 1887, an order was taken for service upon Dot-
terer, trustee, by publication. On May 1, 1890, an order
was passed by which Freeman was allowed to take the
bill *pro confesso* upon making an affidavit "that of his
own personal knowledge the allegations in said bill are
true and were each and all within the knowledge of the
defendants and each of them, and that each and all of
the allegations in said bill must have been admitted
to be true in an honest answer by them to said bill."
The order recited that the case was continued from time
to time, but assigned for trial at the last term of the
court; that it was passed without trial because not
reached; that it was regularly assigned for trial for May
1, 1890 ; that notice thereof had been given defendants;
that no demurrer, plea or answer had been filed; and that
discovery was not waived. A verdict and decree were ac-
cordingly taken, that the deed to Dotterer, trustee, be
cancelled ; that he and Mary A. Newby convey the land
to complainant, and in lieu thereof the verdict and decree
operate as a conveyance ; that complainant pay to the
trustee or to Mary A. Newby $300 with interest at twelve
per cent., and that all question of mesne profits and set-
off for improvements be left open for adjustment between
the parties, or, in default thereof, be settled by subse-
quent and separate suit. The defendants, and especially
Mrs. Newby and Dotterer, trustee (as the only ones
having any real interest in the issue), moved for a new
trial, which motion was overruled, and they excepted.

Besides the general grounds that the verdict was
contrary to law, evidence, etc., it was alleged that it was
without any truthful evidence to support it; and that
J. M. Newby, who expected to look after the interest of
Dotterer, trustee, and Mary A. Newby, was providen-

tially prevented from attending the court on May 1st, and a few days before the trial, when asked by J. R. Lamar, plaintiff's counsel, who his attorney was, and not then knowing that the case had been assigned for trial, had expected to employ counsel, but on that day, from providential cause, was prevented and continued so to be prevented until after the trial; and that said Newby did not know that the case had been tried until about May 10, 1890. The motion was amended by filing, as a part thereof, a copy of the answer made to a bill filed by Freeman to the April term, 1882, of the superior court, the affidavit of Roberts used upon the hearing for injunction under that bill, the judgment refusing the injunction, and the judgment dismissing the bill on demurrer; also affidavits by Dotterer, Mrs. Newby, Roberts, and Picquet, a practicing attorney; and a new trial was asked for, because the record showed that the allegations under which Freeman procured his verdict and decree were untrue and without foundation in fact, and the court in granting the same was misled as to facts which its own records would have shown if brought to its attention, because the record showed that Freeman had already had his day in court in reference to all the facts in the case and the issues had been decided against him, and because the evidence before the court upon this motion for new trial showed that the claim of Freeman was unfounded, and the verdict and decree contrary to equity and the principles of justice, working gross wrong and injury upon the parties owning the property.

The motion was overruled, and defendants excepted.

Freeman's bill of 1882 was against Newby, Dotterer, trustee of Mrs. Newby, and McLemore, county constable, alleging, in brief: He owns the property, and it is held as collateral security for the Bank of Augusta for a loan to him of $300, or if the bank has assigned the claim, then it is to be held by Newby as such collateral security.

A copy of one of the notes is attached as an exhibit. Complainant has been in possession since ——, 1881, claiming the property as his own, exercising all acts of ownership over it, and recognized as the owner by the bank. Newby is illegally and fraudulently seeking to put him out of possession without shadow of right, claiming to be the agent for said trustee, and has made affidavit that complainant is a tenant at sufferance of the trustee, and had a magistrate to issue a warrant for the removal of complainant, which warrant is in the hands of McLemore as constable, who is seeking to oust him. Complainant has made affidavit in the words of section 4079 of the code, and has tendered it and a bond signed by himself with one Austin as security, payable to Dotterer as trustee, etc., which counter-affidavit and bond are in the hands of the constable, who however alleges he will put complainant out of the premises. The allegation that complainant is a tenant at sufferance or at leave is untrue, and the affidavit in that respect is totally unfounded. To the best of his belief Newby is not the agent of the trustee nor authorized to make the affidavit. The premises belong to complainant, and Newby and the constable are insolvent. He prays for perpetual injunction against proceeding with the warrant, general relief, and *subpœna* addressed to Newby and said trustee.

This bill was answered by Dotterer, trustee, and by Newby, as follows : Freeman was a tenant at sufferance of the trustee, got possession of the premises in dispute by a trick and fraud, and was simply allowed to remain by sufferance of the trustee. The premises are not occupied by Freeman or his family, but have been by him rented out and are now vacant, the last tenant who had rented them removing on March 1, 1882, because the house had become untenantable for want of repairs, and the house is now wholly out of repair, is leaking and

daily going to ruin.  Freeman refuses to have the necessary repairs made and to allow Dotterer, trustee, to have them made; and Freeman has been renting out the premises and appropriating the rent to his own use without the shadow of a legal claim or equitable right to the premises.  The property was sold at sheriff's sale for city taxes as the property of Picquet on April 1, 1879, and bid in by Freeman for $300, who subsequently transferred his bid to Roberts who, upon payment of the money, received the sheriff's deed.  Roberts was the president of the Bank of Augusta, and by an agreement between him and Freeman the bank was to advance the $300 to pay for the property so sold, and Roberts was to hold the property under the sheriff's deed until Freeman repaid the bank, which repayment was to have been made within sixty days from May, 1879, as shown by Freeman's promissory note, and upon payment of the note and interest Roberts was to convey the property to Freeman.  Freeman failed to pay the note or any part of it at maturity, and it was renewed by the bank from time to time until March 10, 1880, when Freeman again renewed it for thirty days.  Each of the notes were what were called collateral notes, and the collateral deposited was named as a "deed of property formerly belonging to A. D. Picquet to William S. Roberts for $300."  The note also made further provisions for sale of the property and application of the proceeds (all above set forth).  A copy of the note was annexed as an exhibit.  Freeman failed to pay the note or any part of it at maturity and it remained unpaid until March 8, 1881, when Dotterer, trustee, paid it with interest and received from Roberts, on March 14, 1881, a quit-claim deed to the premises.  Though the bank had the legal right by virtue of the note to sell the premises without notice to Freeman, Newby, who acted for the trustee, desired that actual notice should be given Free-

man of the intention of the bank to sell unless he paid
his note, and Roberts personally gave Freeman the in-
formation and also wrote a note to the counsel with
whom Newby had been advising, to the effect that he,
Roberts, had seen Freeman and Freeman had told him
he intended to have nothing more to do with the prop-
erty, and that if he traded with Newby it was all right
so far as he was concerned. After the receipt of this
information, relying upon its truth as well as upon the
authority in the note, the trade was concluded, and
Dotterer, trustee, at once through Newby entered into
possession and held possession over two months, all
of which was known to Freeman, as Newby was
at the time living in Freeman's family. At the
time of the purchase there was a mortgage out-
standing upon the property for $2,500 and inter-
est. The property was not worth more than $1,200,
but Newby, believing the tax sale divested the lien of
the mortgage, was willing to take the sheriff's title and
test the question, but never would have taken it unless
satisfied that Freeman had no claim. On May 10, 1881,
a *fi. fa.* issuing upon the foreclosure of the mortgage
was levied upon the premises, and they were advertised
for sale upon the first Tuesday in June, 1881. Though
notice was served upon the tenant in possession, Free-
man paid no attention to it, and Dotterer, trustee, inter-
posed a claim, the trial of which resulted in his favor,
but the plaintiff in *fi. fa.* has taken the issue to the Sep-
tember term, 1882, of the Supreme Court. Knowing
that if the lien of the mortgage was held good the whole
property would be gone, Dotterer was indifferent, to
some extent, as to Freeman's possession, he having got
possession by getting the keys upon false representations
from the person with whom Newby left them, and find-
ing that Freeman would not surrender, Dotterer allowed
the matter to remain and Freeman to retain possession

by sufferance until the mortgage question was decided, but since the issue has been decided in his favor by the lower court, and believing that decision will be sustained by the Supreme Court, he desired to resume possession to make repairs, etc., and rent the property. Demand was made upon Freeman for possession and he declined to deliver February 27, 1882, and said trustee in good faith, after taking legal advice, took out the dispossessory warrant mentioned in the bill. Freeman was given legal notice and tendered a counter-affidavit accompanied by a bond the security upon which was wholly insolvent, for which reason alone the officer declined to receive it. Freeman did not pretend that the security had any property nor offer any other security, but late in the afternoon of the day upon which the counter-affidavit and bond were tendered, Freeman's attorney informed the officer that he had obtained an injunction, etc. Defendant prayed that Freeman's bill be dismissed and the restraining order be dissolved, and that Freeman be required to account for and pay over to him all money received by him from the property since November 13, 1880, and be enjoined from the further use and possession of the property, and perpetually enjoined from setting up his pretended claim and further interfering with the rights of the trustee.—The affidavit of Roberts, used upon the hearing for injunction, corroborated this answer, as to the transactions between Freeman and the bank and the bank and Newby as agent for Dotterer, trustee, etc. In April, 1882, the judge denied the injunction prayed for by Freeman, and in June, 1882, his bill was dismissed on demurrer for want of equity.

The affidavits of Dotterer and Mrs. Newby are to this effect: Not long after the filing of the bill of 1884, they learned through J. M. Newby that Freeman had stated to him he did not expect to go on with the suit but had dropped it, and they heard nothing

further as to the matter until February, 1887, when the trustee received a letter from Foster & Lamar, asking him to acknowledge service, which he declined to do. Newby afterwards came to Augusta and reported that he had again seen Freeman, and that Freeman stated he had abandoned the case and expected to have no further connection with it; relying on which, deponent gave the matter no further thought and never again heard of it until the verdict and decree of May 1, 1890. Deponents reside in Charleston. The facts set forth in their answer to the bill of 1882 are true, and Freeman must have known that the statements in his second bill were untrue and had already been denied on oath by all parties in interest, and when Freeman made affidavit to his second bill he stated what he must have known was untrue, because the record then of file in this court denied every material allegation in his second bill. If any service by publication was ever effected upon Dotterer, he never saw or had actual notice of it. Since the motion for new trial was filed, his counsel has found the publication inserted for the first time, June 22, 1887. In defending the claim case the trust estate has been put to an expense of nearly $400, and has continued to pay taxes and repairs. The property is now worth about $2,200. Deponents relied upon Newby in attending to the suit and supposed he had given it the necessary attention, or would have done so had he not been misled by the statements of Freeman above mentioned. Had deponents known the case was pending, they would certainly have employed counsel and defended the same; they did employ counsel as soon as they learned of the decree.

The affidavit of Roberts is, that his former affidavit, above mentioned, was true, and Freeman was given every opportunity to buy the property, that is, to take from the bank and Roberts the title which Roberts held, but

declined to do so or to have any connection whatever with the matter, and freely and voluntarily told Roberts to sell the property to Dotterer upon the payment of the note. The affidavit of Picquet is to this effect: After the bill of 1884 was filed, he was spoken to by Newby in reference to the answer to the bill for Dotterer, trustee, and Mrs. Newby, and was getting up *data* therefor when he was told by Newby that he had seen Freeman and that Freeman had said to him he had decided to drop the whole matter, and deponent did not therefore draw up the answer. Deponent heard nothing further from the case until February, 1887, when he was shown a letter requesting Dotterer to accept service of the bill. He then spoke to Newby, who again repeated that Freeman had stated he had dropped the case, but said he would see Freeman again, and sometime afterwards told deponent he had seen Freeman, who said he had abandoned the case and expected to have nothing further to do with it. Newby died May 25, 1890, over seventy years of age. He was seriously injured by a fall April 25, 1890, and was confined to his bed until some days after May first; he was then very feeble, and was up only a short time when he again went to bed and died. For three months or more before his death, from constant use of liquor and other stimulants he was incapacitated for business, and his memory was not reliable. Up to and for some time after 1887, he was under the impression that Freeman had abandoned the bill, and but for this impression deponent would have drawn the answer of Mrs. Newby and the trustee. Freeman knew that the facts stated in the bill of 1884 were not correct; that the whole matter had been decided against him in a previous bill; and that Mrs. Newby and the trustee had already denied on oath the allegations of his second bill, and had always denied that he had any right or claim to the property or any part of it.

By way of counter-showing Freeman used his bill of 1882, above recited, and the affidavits of himself and of his counsel J. R. Lamar, to whom the management and control of the case was committed. Lamar's affidavit was: Soon after the bill was filed Newby told him that it was something of a family matter and he did not desire any service by publication, as he knew Dotterer would acknowledge service; and deponent feels sure Newby intended to obtain it, but from an oversight or forgetfulness neglected it for several terms, until finally Freeman (who had expressed himself as preferring not to have publication if service could be acknowledged) and deponent agreed it was not worth while to wait longer, and the order was taken and published. Freeman was constantly in deponent's office inquiring after the case and showing the deepest interest in it, and frequently wrote to him about it, and he never at any time heard from Freeman anything that in the slightest indicated an abandonment of the case, a loss of interest in it, or a determination to have nothing more to do with it, but received from him several letters asking when a trial could be had. Deponent was ready to assign it several times, but refrained because of the state of the docket, not desiring to put down the case and bring Freeman to Augusta when the chances were it could not be tried. The case was regularly assigned for the October adjourned term, was so entered on the docket and published in the newspapers in the list of assigned cases, but it was not tried because other business assigned ahead of this took so much time. The case was regularly assigned for trial for May 1, 1890, on the date for assigning cases, and on returning from the court-house deponent saw Newby and told him he had just had the case assigned for trial for May 1st, and wanted to notify him of it as he did not desire to take a snap judgment in the case. He asked Newby who was their attorney; Newby said they did not have any; that

they had come from Charleston the day they were ordered to do so, and the case was not tried. Deponent explained that he did not keep it from being tried at another time, and asked who his lawyer was, that deponent might call on him, as he was going to press for a trial. Newby then said he did not have any, but if he decided to get one he would let him know next day. Newby did not call at deponent's office, and a day or two later he again spoke to Newby about the case, asking who his attorney was, and he said he did not have one and did not know that he would get any. Knowing that J. S. & W. T. Davidson had represented them in the bill of 1882, deponent stated to a member of that firm that the case had been assigned for trial and inquired if they represented them in this case, and was told they did not. Deponent had only a speaking acquaintance with Newby and was not familiar with his habits, but at the time of the conversation referred to, saw no sign of his being mentally unable to attend to business, but, as deponent only spoke to him a moment in each instance, he is unable to say more as to his condition. There was an affidavit corroborating Lamar as to the first of his conversations with Newby.

The affidavit of Freeman was : Since the filing of the bill of 1884, he has always been anxious and urgent for the trial and after it was filed it was passed, as his counsel informed him, to have Dotterer, trustee, made a party, Dotterer having agreed through Newby, as deponent was informed, to acknowledge service and save delay and publicity of service by publication, etc. Finally service was procured, and the case was assigned for trial for May, 1890, and was so published. Deponent never stated to Newby or any one else that he had decided not to go on with the suit and would drop it, and never said anything from which any such conclusion could by any possibility have been drawn. After the filing of the bill

he removed from Augusta and has only been to that city four times since. Since November, 1881, he has not spoken to Newby, and has not written or authorized any one to write to him. Defendants knew he was pressing the suit, and he never wrote, said or did anything from which any one could have understood that he had abandoned it. The allegations in his bill are and were true, and must have been admitted to be true in an honest answer by defendants. Not a single fact stated in his bill is in any way contradicted by defendants in this proceeding. He did not get possession of the keys by trick or fraud, but got them at the request of Roberts upon his promise to rent the property and apply the rent to the payment of the $300 debt, and upon carrying the keys to the bank to be handed to Roberts he found Newby present, and learning that Roberts proposed to turn the keys over to Newby again, deponent refused to permit him to have them for that purpose, and kept them. Thereafter Dotterer, trustee, claiming title under deed from Roberts, instituted proceedings to oust deponent as a tenant at sufferance, which deponent resisted by counter-affidavit, tendering security which was refused by the constable as not being satisfactory, under instructions from defendant's counsel. Thereupon deponent applied for an injunction, on the hearing of which the answer and affidavits attached to the present motion for new trial were filed and the injunction refused. That bill having been filed merely to enjoin the warrant from issuing, and having failed in that, deponent thought no more of that proceeding and did not know it had been heard on demurrer; but he is advised and believes the injunction was refused and demurrer sustained upon the ground that the allegations in the bill did not entitle him to the injunction, as an inability to give other bond did not excuse the legal requirement that an affidavit to oust

could only be met by a counter-affidavit with security satisfactory to the officer. He denies that there has been any adjudication upon the facts or merits of the case. When the foregoing bill was filed he was in default and owed the $300; since then he has tendered the $300 with interest, and put himself in position to assert his claim to the property. He never assented to the purchase of the property by Dotterer or Newby. Newby was a relative of his wife, frequently staying at his house; and sometime in August, 1880, deponent did offer to sell the property to him for what was equivalent to $800, Newby to assume all risk of the mortgage litigation then pending, but Newby refused to accept the offer. Deponent denies ever having told Roberts that he could trade with Newby, or that he would not have anything further to do with it, and that Roberts was at liberty to sell for less than $800. He has always denied that Newby or Dotterer had any title to an interest in the property, further than such as they may have had as holding the note, and has ever insisted that the property was his with an incumbrance of $300 thereon, and before filing the bill and since, has always been willing to pay the sum due and has tendered it.—Portions of this affidavit were corroborated by the affidavit of Mrs. Freeman.

J. S. & W. T. DAVIDSON, for plaintiff in error.

J. R. LAMAR, contra.

BLECKLEY, Chief Justice.

1. The bill does not pray in express terms to set aside the deed from the sheriff to Roberts; nor would it be any cause to set aside this deed that by mistake on the part of Freeman, it conveyed the property to Roberts, the president of the bank which made the loan the deed was intended to secure, instead of directly to the bank as Freeman intended it should be made. The mistake was not mutual. The bank, as well as the president,

was satisfied with the deed as it was, and whether it was made to the one or the other, its effect as to Freeman was the same, its purpose being to secure the loan. Whenever the loan was repaid, the land would be as fully discharged under the conveyance to Roberts as it would if the conveyance had been made to the bank. Moreover, if a mistake on the part of Freeman was made in the original execution of the deed, he must have waived it more than once after he discovered it, for he several times renewed the note given for the loan, and each renewal note, as well as the original, described the deed as a deed made to Roberts.

2. The bill does not complain of usury in the loan or in any note given therefor except the last renewal note, and as to this it does not claim that the note is void, but on the contrary the plaintiff, Freeman, expressly recognizes in his bill that he is still liable thereon "for the principal and lawful interest." The whole charge of the bill in relation to usury is as follows : "Your orator further shows that said note still past due was usurious on its face; that said Roberts, the said bank and said Newby and said Dotterer, at the time of the pretended conveyance of said land, had notice that said note was infected with usury, and that neither said bank nor said Roberts got any title to said land, nor could it or Roberts convey a good title to the said Dotterer or said Newby; that said conveyance was made on March 8th, 1881, without the knowledge or consent of your orator, without taking the course provided by law in said cases, and without even compliance with the terms of said note, if it should be held that, infected with usury as it was, anything therein could authorize a sale of said land; that therefore said conveyance is absolutely void, that said Dotterer has no title to said land."

Obviously this charge relates to the last renewal note alone. If it means to attack the deed from the sheriff

to Roberts as void because of usury in the note, two answers may be made to it. The first is that the deed was coeval with the loan and with the first note given therefor, and if neither the loan nor this first note was tainted with usury—and it is not directly alleged that either was so tainted,—the deed was efficacious in passing title into Roberts for the security of the loan, and that title would not be divested by subsequent usury contracted for in the renewal note; certainly not unless the taint of usury not only rendered that note void but poisoned all the previous contracts for the payment of the loan. That the renewal note is not void so far as principal and lawful interest is concerned, is expressly recognized in the bill, as we have before stated.

The second reason why usury in the renewal note would not affect the validity of the deed is, that the parties to the deed were the sheriff and Roberts, and certainly there never was any usury as between them, or as between the sheriff and the bank for whose security the deed to Roberts was executed. Even usury in the original loan from the bank to Freeman would not have prevented the title from passing into Roberts by the sheriff's deed. The title never was in Freeman. He sought to acquire it eventually by having it first pass into the bank, or into Roberts to secure the bank. If this deed be void, the formal legal title is yet in the defendant in execution, as whose property the sheriff sold the premises; but the title did pass, and whether there was usury or not between Freeman and the bank, Freeman must repay the principal of the loan with lawful interest at least, as a condition precedent to any right legal or equitable to have a conveyance made to himself. The money embraced in the loan was purchase money. *Pope* v. *Heartwell*, 79 *Ga.* 482; *Bugg* v. *Russell*, 75 *Ga.* 837.

It is proper to add that it is by no means certain that the charge above recited from the bill contemplates the

deed from the sheriff to Roberts as an object of attack for usury. It would seem to be directed more immediately to the deed from Roberts to Dotterer, but certainly the latter deed could not be vitiated by a usurious contract between the bank and Freeman. There is no charge that Dotterer paid usury or agreed to pay any, either to the bank or to Roberts. By purchasing the note he simply put himself in the bank's shoes, and by taking a conveyance of the land from Roberts, he succeeded to all the rights which Roberts and the bank had in the land, if to no more.

. 3. The renewal note was on its face negotiable, and the bill charges that the bank, through its president, had sold it to the defendant, Dotterer, trustee for Mrs. Newby, and that he was the holder of it when the bill was filed. Thus Dotterer at that time was the holder of the note, and by the deed from Roberts to himself as trustee, was invested with the legal title to the land. The bill prays for a decree requiring the title to be conveyed to Freeman on payment of the sum due, for a decree cancelling the deed from Roberts to Dotterer as a cloud upon Freeman's title, and for general relief. It alleges a tender made to the bank, offers to do. equity, and prays direction as to how much is due and whether the money should be paid to the bank or to Dotterer, offering to pay it to the one to whom it may be due. No reason is assigned why a tender was not made to Dotterer. There would seem to be no justification for calling him into court, when it was known that he had become the holder of the note, without first tendering payment of principal and lawful interest to him. Until such a tender, no equity to have the deed cancelled would be complete. *Campbell* v. *Murray*, 62 *Ga.* 87. The tender made to the bank was before this deed came into existence, and that tender was not made at the maturity of the note, but long afterwards. It is not alleged that

v S8-32

Dotterer holds as a mere agent for the bank, and nothing appears which would negative his ownership of the note as trustee for Mrs. Newby, or his right to receive the money both as against the bank and as against any rightful claim of Roberts to withhold it. Without intimating whether a tender hereafter made to Dotterer would suffice to put equity in the bill as against him, we are confident that the omission to make and allege a tender prior to the hearing which has been had left the bill deficient in a necessary element to obtain the relief sought. The offer to do equity, etc., is no substitute for making a tender which ought to have been made before the bill was filed.

4. An order was passed that the bill be taken *pro confesso*, and thereupon the facts charged in the bill were taken as confessed on the affidavit such as is prescribed in section 4208 of the code. The court, however, did not decree directly on this affidavit, but submitted the case to a jury, and a verdict was rendered finding, among other things, that the deed from Roberts to Dotterer be cancelled and that Dotterer convey to Freeman. The evidence on which this verdict was founded consisted alone of the charges of the bill and the affidavit above referred to. This being so, there was not enough proved to warrant the finding, and the court should have granted a new trial, the motion therefor being made in due time, because the verdict was contrary to law and without evidence to support it. The bill not showing on its face a state of facts requisite to the specific relief mentioned, there ought to be no decree for that relief, predicated either upon the verdict or directly on the order taking the bill *pro confesso* and the affidavit following up that order. This is sound on principle, and in harmony with the authorities. Thomson *v*. Wooster, 114 U. S. 104.

At the hearing of this motion, certain facts vouched by matters of record in the same court strongly tending

to show that injustice had been done by the verdict, were brought to the attention of the presiding judge. Though these facts were not needed to render the right to a new trial complete, yet they could be looked to as a guide to discretion, and in their presence, we think it was manifest error to overrule the motion. *Judgment reversed.*